AO 91
Rev. 11/82

ORIGINAL

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>JUAN CARLOS FUENTES,<br>aka "Skinny"<br>JOSE BONILLA,<br>aka "Bicho"<br>JUAN MERCADO,<br>aka "Nica" | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>07-   07-1885M |
|---|---|

Complaint for violation of Title 21 United States Code, Section 846 (Conspiracy to Distribute Illegal Narcotics)

| NAME OF MAGISTRATE JUDGE<br>ANDREW WISTRICH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>January 2006 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION :

Beginning in or about January 2006, and continuing to on or about September 14, 2006, in Los Angeles County, within the Central District of California, defendants JUAN CARLOS FUENTES, JOSE BONILLA, and JUAN MERCADO conspired to commit an offense defined in Title 21, United States Code, Section 841(a)(1), namely, (1) possession with intent to distribute, and (2) distribution of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

CLERK, U.S. DISTRICT COURT
NOV 2 2007
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Sean Sterle |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>November 2, 2007 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: E. Martin Estrada     REC: Detention   ME

## AFFIDAVIT

I, SEAN STERLE, having been duly sworn, hereby state:

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for more than nine years.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, Unites States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, the offenses enumerated in The Comprehensive Drug Abuse Prevention and Controlled Substances Act of 1970, Title 21 of the United States Code, as amended.

2.   As an FBI SA, I received basic drug training at the FBI Academy located in Quantico, Virginia.  I later received training from an FBI-taught course in Advanced Investigative Techniques, which focused on the use of sophisticated techniques such as wire interceptions and undercover operations when investigating violent criminal enterprises.  I am a current and active member of the California Narcotics Officer's Association, and I have attended numerous narcotics courses presented by the California Narcotics Officer's Association.

3.   Since November 1998, I have been assigned to the FBI's Los Angeles Division.  From May 2001 until June 2003 and again from August 2005 until the present, I have been assigned to the Los Angeles Metropolitan Task Force on Violent Crime ("LAMTFVC").

The LAMTFVC is comprised of numerous federal and local law
enforcement officers whose mission includes the investigation of
the most violent gangs, violent crimes, and distribution of
narcotics within the Los Angeles area.  During my assignment to
the LAMTFVC, I have participated in numerous investigations
involving violent gang members and narcotics traffickers,
including investigations involving the organized distribution of
illegal drugs by street gangs.  I have also participated in
searches and the execution of search warrants that have resulted
in the seizure of illegal drugs and evidence of drug trafficking.
I have made arrests for drug-related offenses, and have spoken on
numerous occasions with suspects and defendants, as well as law
enforcement officers and investigators more experienced than
myself, concerning the methods and practices of drug traffickers
and gang members.  I have also supervised the activities of
informants who have provided information and assistance to
ongoing drug and gang investigations.

PURPOSE OF AFFIDAVIT

3.  This affidavit is made in support of a complaint against
and arrest warrants for the following individuals: (1) JUAN
CARLOS FUENTES ("FUENTES"), a.k.a. "Skinny," (2) JOSE MIGUEL
BONILLA ("BONILLA"), a.k.a. "Bicho," and (3) JUAN MAYORGA MERCADO
("MERCADO"), a.k.a. "Nica."  As set forth below, there is
probable cause to believe that FUENTES, BONILLA, and MERCADO have
committed violations of Title 21, United States Code, Section

2

846, Conspiracy to Distribute Illegal Narcotics.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses during this investigation. This affidavit is intended to show that there is probable cause for the requested complaint and arrest warrants, and does not purport to set forth all of my knowledge of, or investigation into, this matter.

PROBABLE CAUSE

5. Starting in or about December 2005, Confidential Source #1 ("CS-1") provided information to the LAMTFVC regarding FUENTES, BONILLA, and their drug trafficking activities. CS-1 resides in an area of Los Angeles claimed as territory by the one of the cliques of the Mara Salvatrucha-13 ("MS-13") street gang. CS-1 has a criminal record and is being paid for his/her work.

6. Information provided by CS-1 has been verified and deemed reliable by the FBI through independent investigation, including information from other law enforcement officials, review of recorded conversations and controlled narcotics purchases. CS-1 is cooperating with the FBI in exchange for money. I have reviewed the criminal history record for CS-1, and to my knowledge, CS-1 has no prior felony convictions. CS-1 has the following six misdemeanor convictions: (1) a 1990 conviction for resisting arrest; (2) a 1999 conviction for Driving Under the Influence (DUI); (3) a June 22, 2000 conviction for DUI; (4) a

3

June 22, 2000 conviction for driving with a suspended license;
(5) an August 1, 2000 conviction for DUI; and (6) a January 13,
2006 conviction for disturbing the peace.  Additionally, CS-1 was
arrested four times between 2001 and 2007 for violation of a
restraining order, domestic violence, carrying a firearm and
criminal threats.

    7.   I have learned from my work on this investigation, my
discussions with confidential sources and with Los Angeles Police
Department ("LAPD") Officers that FUENTES and BONILLA are both
documented members of the Normandie Locos clique ("NLS") of the
MS-13 street gang.

A.  January 26, 2006 Sale of Methamphetamine by FUENTES

    8.   On January 26, 2006, CS-1, acting at the direction of
myself, SA Gary H. Bennett, Jr., SA Roberto Basteris, and LAPD
Officer Frank Flores, had telephone contact with FUENTES and then
met with FUENTES and purchased methamphetamine.  The meeting was
digitally audio and video recorded.  According to reports written
by SA Basteris and myself, and based on our own observations and
interview of CS-1, the following events took place:

        a.   On January 25, 2006, CS-1, at the direction of
myself, SA Basteris and Officer Flores, spoke to FUENTES on
FUENTES' mobile telephone, (213) 210-6906.  During the telephone
call, CS-1 informed FUENTES, in a coded manner, that CS-1 wished
to purchase one ounce of methamphetamine.  In a coded manner,
FUENTES told CS-1 that he was selling one-eighth of an ounce

4

quantities of methamphetamine for $100 (one ounce for $800).
After CS-1 asked for a reduction in price, FUENTES agreed to sell
the ounce of methamphetamine to CS-1 for $700.  CS-1 and FUENTES
agreed that the sale would occur the following day, on January
26, 2007.  The call was recorded.  Because the recorded telephone
conversation took place in Spanish, I reviewed a draft transcript
that was later prepared and translated into English regarding the
conversation.  The draft transcript is consistent with CS-1's
account of the conversation.

          b.   Prior to the January 26, 2006 meeting with
FUENTES, CS-1 was fitted with an audio/video recording device.
CS-1 and CS-1's vehicle were searched for contraband by SA
Roberto Basteris and Officer Frank Flores.  None was found.  CS-1
was then provided with $700 in United States currency.  CS-1 was
placed under surveillance by members of the LAMTFVC.

          c.   At approximately 3:20 p.m., CS-1 called Officer
Flores and informed him that CS-1 and FUENTES spoke via telephone
about when FUENTES would be able to deliver the methamphetamine
to CS-1.  CS-1 reported that FUENTES informed him/her that
FUENTES would not be able to deliver the narcotics to CS-1 until
later in the evening.

          d.   At approximately 11:20 p.m., CS-1 advised that
he/she received a telephone call from FUENTES, who stated that
one of his "lookouts" had observed undercover police in the area
of the transaction location and that he would call CS-1 later

                                5

with an new transaction location to complete the narcotics sale. At approximately 11:40 p.m., FUENTES telephoned CS-1 and informed him/her of the new location the narcotics transaction was to take place.    At approximately 11:45 p.m., CS-1, at my direction, drove to the new transaction location chosen by FUENTES, at the corner of Melrose Avenue and Wilton Place in Los Angeles.

        e.   At approximately 11:50 p.m., CS-1 arrived at the transaction location in his/her vehicle.   CS-1 exited the vehicle and FUENTES exited the front passenger seat of a black Honda. FUENTES walked over to the front passenger side door of CS-1's vehicle and leaned into CS-1's vehicle.   FUENTES removed a plastic bag of what appeared to be methamphetamine out of his jacket pocket and placed it on the passenger seat.   CS-1 then handed FUENTES $700.   FUENTES asked CS-1 if they were going to do business in the future.   At approximately 11:58 p.m., CS-1 called Officer Flores and informed him that CS-1 had just purchased $700 of methamphetamine from FUENTES at the secondary transaction location.   Officer Flores directed CS-1 to return to meet with members of the LAMTFVC.

        f.   CS-1 then met with me and handed me a plastic bag containing a substance which appeared to be methamphetamine.   SA Basteris searched CS-1 for additional contraband.   None was found.   SA Basteris and Officer Flores searched CS-1's vehicle for additional contraband.   None was found.   Because the audio recorded conversation of the meeting between CS-1 and FUENTES

6

took place in Spanish, I reviewed a draft transcript that was later prepared and translated into English regarding the conversation.  The draft transcript is consistent with CS-1's account of the conversation which occurred at the meeting.  Upon reviewing the video of the meeting between CS-1 and FUENTES, myself and members of the LAMTFVC identified FUENTES as the person who met with CS-1.

g.   A subsequent Drug Enforcement Administration ("DEA") laboratory analysis of the substance obtained during the January 26, 2006 transaction between CS-1 and FUENTES determined that the substance contained approximately 14 grams of actual methamphetamine.

B.   March 2, 2006 Sale of Methamphetamine by FUENTES and BONILLA

9.   On March 2, 2006, CS-1, acting at the direction of myself, SA Bennett, SA Basteris and Officer Flores, negotiated a two ounce methamphetamine purchase with FUENTES on the telephone. CS-1 then met with BONILLA, who provided the methamphetamine to CS-1.  The telephone communications with FUENTES were audio recorded and the meeting with BONILLA was digitally audio and video recorded.  According to reports written by SA Basteris and myself, and based on our own observations and interview of CS-1, the following events took place:

a.   On March 1, 2006, at approximately 3:17 p.m., CS-1, at the direction of myself and SA Basteris, spoke with FUENTES, on his mobile telephone, (213) 210-6909.  FUENTES informed CS-1

7

that he would be changing his mobile telephone number to (323) 445-0258. During the recorded call, CS-1 and FUENTES agreed that FUENTES would sell two ounces of methamphetamine to CS-1 for $1,300 the following day. Because the recorded conversation took place in Spanish, I reviewed a draft transcript that was later prepared and translated into English regarding the conversation. The draft transcript is consistent with CS-1's account of the conversation.

        b.    On March 2, 2006, at approximately 2:33 p.m., CS-1, at the direction of myself, SA Basteris and Officer Flores, spoke with FUENTES on FUENTES' new mobile telephone. During the recorded call, FUENTES told CS-1 that he would deliver the two ounces of methamphetamine between 4:00 p.m. to 4:30 p.m. FUENTES asked CS-1 if he/she wanted the two ounces in one plastic bag or in two separate bags (one ounce per bag). CS-1 requested the two ounces in one plastic bag. CS-1 asked FUENTES if the price was $1,300 for two ounces. FUENTES affirmed. Because the recorded conversation took place in Spanish, I reviewed a draft transcript that was later prepared and translated into English regarding the conversation. The draft transcript is consistent with CS-1's account of the conversation.

        c.    Prior to the March 2, 2006 meeting, CS-1 was fitted with an audio/video recording device. CS-1 and CS-1's vehicle were searched for contraband by SA Basteris and Officer Flores. No contraband was found. CS-1 was provided with $1,300 in United

8

States currency.  CS-1 was placed under surveillance by members
of the LAMTFVC.

       d.  At approximately 4:30 p.m., CS-1, at the direction
of myself, SA Basteris and Officer Flores, met with BONILLA at
Sierra Vista Avenue, Los Angeles, the transaction location which
was agreed upon by FUENTES and CS-1.  BONILLA arrived by car at
the location.  CS-1 handed BONILLA $1,300.  BONILLA was having
trouble counting the money so CS-1 and BONILLA walked back behind
a building where BONILLA could count the $1,300 more slowly.

       e.  CS-1 and BONILLA then walked back to BONILLA's
vehicle and BONILLA sat down in the drivers seat.  BONILLA
informed CS-1 that the methamphetamine was on the front passenger
seat of his vehicle.  CS-1 walked over and stood next to the
front passenger door and saw a plastic bag containing what looked
to be methamphetamine inside a black hat on the passenger seat.
CS-1 reached into BONILLA's vehicle and picked up the plastic
bag.  BONILLA then drove away from the location in his vehicle.
Because the recorded conversation of the meeting between CS-1 and
BONILLA took place in Spanish, I reviewed a draft transcript that
was later prepared and translated into English regarding the
conversation.  The draft transcript is consistent with CS-1's
account of the conversation which occurred during the meeting.
Upon reviewing the video of the meeting between CS-1 and BONILLA,
myself and members of the LAMTFVC identified BONILLA as the
person who met with CS-1.

f.   CS-1 then met with me and handed me the plastic bag containing what appeared to be methamphetamine that he/she had purchased from FUENTES and BONILLA.  CS-1 and CS-1's vehicle were searched by SA Basteris and Officer Flores for contraband, and none was found.

g.   A subsequent DEA laboratory analysis of the substance obtained during the March 2, 2006 transaction between FUENTES, BONILLA, and CS-1 determined that the substance contained approximately 12.9 grams of actual methamphetamine.

C.   April 18, 2006 Sale of Methamphetamine by FUENTES

10.   Starting in or about April 2006, another confidential source, Confidential Source #2 ("CS-2"), provided information to the LAMTFVC regarding FUENTES, who controlled the methamphetamine trafficking enterprise of the MS-13 NLS clique.  According to CS-2, MS-13 NLS gang members BONILLA and MERCADO sold methamphetamine for FUENTES.  CS-2 has resided in an area of Los Angeles claimed as territory by the MS-13 NLS clique.

11.   I have reviewed the criminal history record for CS-2, and I am aware that CS-2 was convicted of felony assault with a dangerous weapon (2005) and was arrested for threatening crime with intent to terrorize (1999).  I am also aware that CS-2 is receiving financial compensation in exchange for working with law enforcement.  Additionally, CS-2 is an illegal alien and has received immigration benefits in exchange for working with law enforcement, to include deferral of deportation proceedings.

Information provided by CS-2 has been verified and deemed reliable by the FBI through independent investigation, including information from other law enforcement officials, witness interviews, review of telephone records and recorded conversations, and controlled narcotics purchases.  I have found CS-2 to be a reliable source of information.

12.  On April 18, 2006, CS-2, acting at the direction of myself and SA Bennett, met with FUENTES and purchased methamphetamine.  The meeting was digitally audio recorded.  According to reports written by SA Bennett and me, and based on our and interview of CS-2, the following events took place:

a.  On April 18, 2006, at approximately 1:35 p.m., CS-2, at the direction of myself and SA Bennett, contacted FUENTES on his mobile telephone, (323) 253-2728.  During their conversation, CS-2 informed FUENTES that he/she was ready to purchase an ounce of methamphetamine.  FUENTES told CS-2 that it would be at least an hour before he could meet with CS-2, but FUENTES advised CS-2 of the location they would complete the methamphetamine transaction.  At approximately 1:55 p.m. and approximately 2:25 p.m., CS-2 and FUENTES spoke on the telephone regarding the methamphetamine transaction and when FUENTES would arrive at the transaction location.  Due to a technical malfunction, the recordings of the above conversations were erased.

b.  Prior to the April 18, 2006 meeting with FUENTES,

11

CS-2 was fitted with an audio recording device.  CS-2 was searched by SA Bennett for contraband, and none was found.  CS-2 was then provided with $700 in United States currency.

c.  At approximately 2:30 p.m., CS-2 then walked to the pre-arranged transaction location, under surveillance by members of the LAMFFVC.  CS-2 waited for FUENTES to arrive at the location and spoke with FUENTES several times on the telephone.

d.  At approximately 4:10 p.m., a white four door Lexus sedan pulled up to the transaction location, driven by an unknown male with an "MS" tattoo on his neck and FUENTES sitting in the front passenger seat.  CS-2 entered the Lexus and sat in the rear driver side seat.  FUENTES handed CS-2 what appeared to be methamphetamine wrapped in clear plastic bag and CS-2 handed FUENTES $700.  CS-2 then exited the Lexus.

e.  CS-2 then met with myself and SA Bennett and he/she handed SA Bennett what appeared to be methamphetamine, wrapped in clear plastic, that CS-2 had purchased from FUENTES.  CS-2 was then searched by SA Bennett and no additional contraband was found.  Because the recorded conversation of the meeting between CS-2 and FUENTES took place in Spanish, I reviewed a draft transcript that was later prepared and translated into English regarding the conversation.  The draft transcript is consistent with CS-2's account of the conversation which occurred during the meeting.

f.  A subsequent DEA laboratory analysis of the

12

substance obtained during the April 18, 2006 transaction between CS-2 and FUENTES determined that the substance contained approximately 7.9 grams of actual methamphetamine.

D.  April 25, 2006 Sale of Methamphetamine by FUENTES

     13.  On April 25, 2006, CS-2, acting at the direction of myself and SA Bennett, met with FUENTES and again purchased methamphetamine.  The meeting was digitally audio recorded. According to reports written by SA Bennett and me, and based on our interview of CS-2, the following events took place:

          a.  On April 25, 2006, at approximately 3:00 p.m., CS-2, at the direction of myself and SA Bennett, contacted FUENTES on his mobile telephone, (323) 523-2728.  During their recorded conversation, CS-2 informed FUENTES that he/she was ready to buy two ounces of methamphetamine.  CS-2 and FUENTES then agreed upon a location for the narcotics transaction to take place.  Due to a technical malfunction, the recording of this telephone conversation between CS-2 and FUENTES was erased.

          b.  Prior to the April 25, 2006 meeting with FUENTES, CS-2 was fitted with an audio recording device. CS-2 was searched by myself and CS-2's vehicle was searched by LAPD Sargent Pete Zarcone.  No contraband was found.  CS-2 was provided with $1,400 in United States currency.  CS-2 was placed under surveillance by members of the LAMTFVC.

          c.  At approximately 3:14 p.m., CS-2 walked to a Bank of America parking lot and entered a unlicenced non-permit

13

operating taxi cab which drove CS-2 to the pre-arranged
transaction location at the corner of Vermont Avenue and
Washington Boulevard in Los Angeles.

d.   At approximately 3:30 p.m., CS-2 arrived at the
transaction location.  At approximately 3:31 p.m., CS-2 walked
over to a white Honda Accord that FUENTES had just parked at the
meeting location, then entered the Honda's front passenger seat.
CS-2 handed FUENTES $ 1,400 and FUENTES handed CS-2 what appeared
to be methamphetamine wrapped in two plastic bags inside a larger
plastic bag.  FUENTES counted the money while speaking with CS-2.
CS-2 then exited the Honda.

e.   CS-2 met with myself and SA Bennett and he/she
handed SA Bennett and SA Sterle what appeared to be two ounces of
methamphetamine (two clear plastic bags, each appearing to
contain one ounce) that CS-2 had purchased from FUENTES.  The
methamphetamine in one of the plastic bags had a pinkish tint.
CS-2 was then searched by SA Bennett, and no contraband was
found.  Because the recorded conversation of the meeting between
CS-2 and FUENTES took place in Spanish, I reviewed a draft
transcript that was later prepared and translated into English
regarding the conversation.  The draft transcript is consistent
with CS-2's account of the conversation which occurred during the
meeting.

f.   On April 27, 2006, at approximately 2:31 p.m., CS-
2, at the direction of myself and SA Bennett, contacted FUENTES

14

on his mobile telephone, (323) 253-2728.  During the recorded
conversation, CS-2 and FUENTES discussed the quality of the
methamphetamine CS-2 had purchased from FUENTES the previous day.
FUENTES and CS-2 discussed the pinkish color of one of the ounces
of methamphetamine.  FUENTES advised CS-2 that all of the
methamphetamine he sells is oil based.  Because the recorded
telephone conversation took place in Spanish, I reviewed a draft
transcript that was later prepared and translated into English
regarding the conversation.  The draft transcript is consistent
with CS-2's account of the conversation.

   g.  A subsequent DEA laboratory analysis of the
substance obtained during the April 26, 2006 transaction between
FUENTES and CS-2 determined that the substance contained
approximately 15.5 grams of actual methamphetamine.

E.  May 25, 2006 Sale of Methamphetamine by MERCADO and FUENTES

  14.  On May 25, 2006, CS-2, at the direction of myself and
SA Bennett, purchased methamphetamine from MERCADO and FUENTES.
A meeting between CS-2 and MERCADO, and the sale to CS-2 of
methamphetamine by MERCADO and FUENTES were digitally audio
recorded.  According to reports written by SA Bennett and me, and
based on our interview of CS-2, the following events took place:

   a.  On May 22, 2006, CS-2 spoke in person to MERCADO
about purchasing one-eighth ounce ("8-Ball") quantities of
methamphetamine.  CS-2 reported that MERCADO informed him/her
that MERCADO sold methamphetamine on the streets for FUENTES.

15

b.    On May 24, 2006, CS-2 spoke in person to MERCADO and informed him that CS-2 wished to purchase one-half ounce of methamphetamine.  MERCADO told CS-2 to call him the following day when CS-2 had enough money to purchase the one-half ounce.

c.    On May 25, 2006, at approximately 1:00 p.m., CS-2 called MERCADO's mobile telephone, (323) 788-8229, and informed him that CS-2 had enough money to purchase one-half ounce of methamphetamine.  MERCADO told CS-2 to meet him at a specific location to complete the transaction and to call him when CS-2 was near the pre-arranged meeting spot.

d.    Prior to this first meeting on May 25, 2006, CS-2 was fitted with an audio recording device.  CS-2 was searched by myself and CS-2's vehicle was searched by LAPD Sargent Pete Zarcone.  No contraband was found.  CS-2 was provided with $ 440 in United States currency.  CS-2 was placed under surveillance by members of the LAMTFVC.

e.    On May 25, 2006, at approximately 3:11 p.m., CS-2, at the direction of myself and SA Bennett, met with MERCADO at the pre-arranged transaction location.  MERCADO entered CS-2's vehicle and sat in the front passenger seat, while a female identified only as "Alma" sat in the back seat.  CS-2 asked MERCADO if he had the methamphetamine and MERCADO stated that FUENTES still had it and wanted to oversee the drug transaction. MERCADO then telephoned FUENTES and FUENTES informed MERCADO that he would have the methamphetamine ready at 5:30 p.m. that

16

evening.  MERCADO told CS-2 that FUENTES wanted to complete the
transaction closer to FUENTES' residence.

      f.  CS-2 returned to the briefing area and provided
myself and SA Gary Bennett with the $440 United States currency.
CS-2 was searched by SA Bennett.  No contraband was found.
Because the recorded conversation of the meeting between CS-2,
MERCADO, and Alma LNU took place in Spanish, I reviewed a draft
transcript that was later prepared and translated into English
regarding the conversation.  The draft transcript is consistent
with CS-2's account of the conversation which occurred during the
meeting.

      g.  Prior to the second meeting on May 25, 2006, CS-2
was fitted with an audio recording device.  CS-2 and CS-2's
vehicle were searched by SA Gary Bennett.  No contraband was
found.  CS-2 was provided with $440 in United States currency.
CS-2 was placed under surveillance by members of the LAMTFVC.

      h.  At approximately 5:23 p.m., MERCADO and a male
identified as "Lil Scrappy," (believed to be MS-13 gang member
Melvin Palacios), entered CS-2's vehicle.  MERCADO sat in the
front passenger seat and "Lil Scrappy" sat in the back seat.  At
approximately 5:45 p.m., CS-2's vehicle arrived at the pre-
arranged transaction location, and the three men exited CS-2's
vehicle and stood next to it.

      i.  At approximately 5:50 p.m., FUENTES was observed
entering a white Honda Accord which was parked in front of his

17

residence.  At approximately 5:55 p.m., FUENTES arrived at the pre-arranged transaction location, at the corner of Vermont Avenue and Vernon Avenue in Los Angeles, in the white Honda Accord and remained seated in the driver seat.

        j.  CS-2 gave MERCADO $440 United States currency. MERCADO then walked over to FUENTES, still seated in the Honda, and handed the cash to FUENTES.  FUENTES handed MERCADO a plastic bag containing what appeared to be methamphetamine.  MERCADO walked back to CS-2's vehicle and handed the plastic bag of what appeared to be methamphetamine to CS-2, while MERCADO and CS-2 were inside CS-2's vehicle.  FUENTES and CS-2 (along with MERCADO and "Lil Scrappy") then drove away from the transaction location in their respective vehicles.

        k.  After dropping off MERCADO and "Lil Scrappy," CS-2 returned to the briefing area and handed myself and SA Bennett a plastic bag containing what appeared to be methamphetamine, which CS-2 had purchased from MERCADO and FUENTES.  CS-2 was searched by myself, and CS-2's vehicle was searched by LAPD Officer Elias Villasenor and SA Juan Valenzuela.  No contraband was found. Because the recorded conversation of the meeting between CS-2, MERCADO, "Lil Scrappy," and FUENTES took place in Spanish, I reviewed a draft transcript that was later prepared and translated into English regarding the conversation.  The draft transcript is consistent with CS-2's account of the conversation which occurred during the meeting.

1. A subsequent DEA laboratory analysis of the substance obtained during the May 25, 2006 transaction between MERCADO, FUENTES and CS-2 determined that the substance contained approximately 4 grams of actual methamphetamine.

F. Auqust 11, 2006 Sale of Methamphetamine by MERCADO

15. On August 11, 2006, CS-2, acting at the direction of myself and SA Gary Bennett, met with MERCADO and purchased methamphetamine. An attempt was made to digitally audio record the meeting but due to a technical malfunction of the recording device, it was not recorded. According to reports written by SA Bennett and me, and based on our interview of CS-2, the following events took place:

a. On August 10, 2006, CS-2 spoke with MERCADO and MERCADO stated that he had good quality methamphetamine which he would sell to CS-2 for $100 per "8-Ball" (one-eighth ounce) or one full ounce of the methamphetamine for $600. CS-2 and MERCADO agreed to talk later about a transaction the following day.

b. On August 11, 2006, at approximately 12:30 p.m., CS-2 saw MERCADO and told him that CS-2 would purchase an ounce of methamphetamine from him later that evening. MERCADO instructed CS-2 to come by his apartment building at 7:30 p.m. to complete the narcotics transaction.

c. Prior to the August 11, 2006 meeting with MERCADO, CS-2's vehicle was fitted with an audio recording device. CS-2 and CS-2's vehicle was searched by SA Bennett. No contraband was

19

found.  CS-2 was then provided with $600 United States currency to purchase methamphetamine from MERCADO and $150 United States currency to pay "protection money" to another subject of the investigation.  CS-2 was placed under surveillance by members of the LAMTFVC.

d.  At approximately 8:09 p.m., CS-2's vehicle arrived at MERCADO's apartment building, located at Fedora Street, Los Angeles, and saw MERCADO standing in front of it.  MERCADO walked over to CS-2's vehicle and entered the front passenger seat.  CS-2 began driving and MERCADO handed CS-2 a clear plastic bag containing what appeared to be methamphetamine.  CS-2 handed MERCADO $600 United States currency.  CS-2 then stopped the vehicle and MERCADO exited the car.  CS-2 drove away.  Before returning to the meeting location, CS-2 met with the other subject and gave this individual $150.

e.  CS-2 then returned to the briefing location and met with myself, SA Scott Hill and SA Bennett, and handed over the plastic bag containing what appeared to be methamphetamine that he/she had purchased from MERCADO.  SA Bennett searched CS-2 and CS-2's vehicle.  No contraband was found.  SA Bennett recovered the digital audio recording device from CS-2's vehicle.  (As indicated above, the recording device malfunctioned and did not record any conversations.)

f.  A subsequent DEA laboratory analysis of the substance obtained during the August 11, 2006 transaction between

20

CS-2 and MERCADO determined that the substance contained
approximately 11.7 grams of actual methamphetamine.

G.   September 14, 2006 Sale of Methamphetamine by FUENTES

16.   On September 14, 2006, CS-2, acting at the direction of
myself and SA Bennett, again purchased methamphetamine from
FUENTES.   The meeting was digitally audio recorded.   According to
reports written by SA Bennett and me, and based on our interview
of CS-2, the following events took place:

a.   On September 14, 2006, at approximately 1:44 p.m.,
CS-2 spoke to FUENTES on FUENTES' mobile telephone, (323) 790-
9329.   During the recorded call, FUENTES informed CS-2 that he
could sell CS-2 $200 of methamphetamine.   FUENTES told CS-2 that
he would meet him/her at a transaction location in 15 to 20
minutes.   Because the recorded telephone conversation took place
in Spanish, I reviewed a draft transcript that was later prepared
and translated into English regarding the conversation.   The
draft transcript is consistent with CS-2's account of the
conversation.

b.   Prior to the September 14, 2006 meeting, CS-2 was
fitted with an audio recording device.   CS-2 was searched and no
contraband was found.   CS-2 was provided with $200 in United
States currency.   CS-2 was placed under surveillance by members
of the LAMTFVC.

c.   At approximately 2:00 p.m., CS-2 arrived at the
pre-arranged transaction location, at the corner of Vermont

21

Avenue and Washington Boulevard, Los Angeles, via an unlicenced
non-permit operating taxi cab.  While waiting for FUENTES, CS-2
saw and began speaking with MS-13 Francis Locos clique gang
member Salvador Ramirez ("Ramirez"), a.k.a. "Trigger."  Ramirez
informed CS-2 that he was also waiting to purchase
methamphetamine from FUENTES.

   d.  At approximately 2:16 p.m., a Nissan Altima arrived
at the transaction with BONILLA driving and FUENTES in the front
passenger seat.  FUENTES exited the vehicle and placed a plastic
bag with appeared to be methamphetamine on the front passenger
seat of Ramirez's vehicle (Honda Accord).  Ramirez then handed an
unknown amount of money to FUENTES.  CS-2 then handed FUENTES
$200 United States currency, and FUENTES handed CS-2 a plastic
bag containing what appeared to be methamphetamine.  FUENTES
entered the Nissan Altima and he and BONILLA drove away from the
transaction location.  CS-2 sat in Ramirez' Honda and spoke with
him for a short time.  CS-2 then departed the location in an
unlicenced non-permit operating taxi cab.

   e.  CS-2 met with myself and SA Bennett and he/she
handed SA Bennett and myself a plastic bag containing what
appeared to be methamphetamine that CS-2 had purchased from
FUENTES.  CS-2 was searched by SA Bennett and no contraband was
found.  Because the recorded conversation of the meeting between
CS-2 and FUENTES took place in Spanish, I reviewed a draft
transcript that was later prepared and translated into English

regarding the conversation.  The draft transcript is consistent with CS-2's account of the conversation which occurred during the meeting.

f.  A subsequent DEA laboratory analysis of the substance obtained during the September 14, 2006 transaction between CS-2 and FUENTES determined that the substance contained approximately 2.9 grams of actual methamphetamine.

CONCLUSION

17.  Based on my training, experience and the facts set forth above, I believe that there is probable cause to believe that JUAN CARLOS FUENTES, JOSE MIGUEL BONILLA, and JUAN MAYORGA MERCADO have violated Title 21, United States Code, Section 846, Conspiracy to Distribute Illegal Narcotics.

SEAN STERLE
Special Agent - FBI

Subscribed and sworn to before me
this __2__ day of November 2007

UNITED STATES MAGISTRATE JUDGE

23